RENE L. VALLADARES
Federal Public Defender
Nevada State Bar No. 11479
SEAN A. MCCLELLAND
Assistant Federal Public Defender
Nevada State Bar No. 16581
HEIDI A. OJEDA
Assistant Federal Public Defender
Nevada State Bar No. 12223
200 S. Virginia Street, Suite 340
Reno, Nevada 89501
(775) 321-8451
Sean_McClelland@fd.org
Heidi_Ojeda@fd.org

Attorneys for LEONARDO F. BLUNDO

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

UNITED STATES OF AMERICA,

Plaintiff,

v.

LEONARDO F. BLUNDO,

Defendant.

Case No. 2:26-cr-00034-JAD-EJY

**MOTION TO DISMISS FOR VINDICTIVE AND SELECTIVE PROSECUTION OR, ALTERNATIVELY, FOR DISCOVERY**

[Evidentiary Hearing Requested]

## I. INTRODUCTION

Leo Blundo is the chair of the Nye County Republican Party. Sigal Chattah—his political rival who told Mr. Blundo's then-wife that he "better watch out" because "he does not know who he is fucking with"—was previously prosecuting him as head of the U.S. Attorney's Office. The Deputy Attorney General's office reportedly ordered Ms. Chattah recused from this

matter because of her conflicts of interest.[1] Yet, according to recent reporting from Bloomberg Law based on three sources familiar with Ms. Chattah's tenure, Ms. Chattah apparently refused to honor that agency-required recusal. Despite repeated warnings that she was violating it, she reportedly continued to press the line prosecutors for status updates about Mr. Blundo.[2]

The reason for the ordered recusal—and for Ms. Chattah's defiance of it—is apparently simple: Mr. Blundo is Ms. Chattah's political rival. They have different visions of the future of the Republican Party. And they have repeatedly clashed as a result, including over a 2023 censure resolution against Ms. Chattah that Mr. Blundo refused to block. And as the attached materials illustrate, Ms. Chattah's conduct toward Mr. Blundo because of that rivalry appears characterized by evidence of personal animus. She has repeatedly called him an "asshole"—a "pompous" "bad person" she "cannot stand."[3] She has encouraged his then-wife to leave him.[4] And she explicitly threatened him after he did not block the censure resolution; as she put it, he "better watch out" because "he does not know who he is fucking with."[5]

But for Ms. Chattah's personal and political history with Mr. Blundo, this case would not have been brought. After years of line investigators and prosecutors declining to charge Mr. Blundo, Ms. Chattah's office sent Mr. Blundo a target letter the month after she assumed office. Then, two weeks after she "exorcised" the office of "[d]ead weight" career supervisors, her

---

[1] Ben Penn, *Trump's Chief Nevada Prosecutor Shirks DOJ Orders, Boosts Allies*, BLOOMBERG LAW (June 3, 2026), Ex. A at 1, 4, also available at https://news.bloomberglaw.com/us-law-week/trumps-chief-nevada-prosecutor-shirks-doj-orders-boosts-allies.

[2] *Id.*

[3] Melissa Blundo Decl. ¶¶ 8, 10, Ex. K.

[4] *Id.* ¶ 10.

[5] *Id.* ¶ 8; *see also* Troy La Mana Decl. ¶¶ 8–12, Ex. L (identifying similar reprisals by Ms. Chattah and her supporters against the sponsor of the censure resolution).

office indicted Mr. Blundo.[6] All the while, Ms. Chattah was reportedly demanding status updates on Mr. Blundo's case in violation of DOJ's own recusal order barring her involvement.

This case requires dismissal on at least two grounds:

- *First*, this appears to be a vindictive prosecution. Its driving force is a prosecutor's documented personal and political animus toward the man she is prosecuting—animus so plain that DOJ itself barred her from this case. That alone warrants dismissal.
- *Second*, this appears to be a selective prosecution. It singles out the former lead federal prosecutor's political rival for charges the government does not bring against similarly situated people who never crossed her—indeed, charges it did not bring against Mr. Blundo for years before Ms. Chattah began leading the office. Less than two-tenths of one percent of flagged PPP loans have resulted in prosecution. And no such loans in Nye County—Mr. Blundo's home—have been prosecuted. That Mr. Blundo was singled out for such prosecution is dismissal-warranting selectivity.

Under either framework, the Constitution bars this prosecution.

Accordingly, absent a credible rebuttal of the apparent vindictiveness and selectivity of this prosecution, this case should be dismissed with prejudice. At a minimum, the Court should order discovery into the government's charging decisions and hold an evidentiary hearing at which Ms. Chattah and DOJ officials familiar with her reported recusal violations and other relevant facts testify under oath.

## II. BACKGROUND

### A. For over four years, investigators and prosecutors repeatedly declined to prosecute Mr. Blundo.

The government's investigation here is over four years old and was repeatedly closed before Ms. Chattah took office. The investigation started from a single tip from an "anonymous

[6] Sigal Chattah (@Chattah4Nevada), X (May 31, 2026, at 8:54 p.m.), https://perma.cc/3VAS-BJA3.

complainant" in March 2022.[7] In response to that tip (and a variety of follow-on investigative steps), Small Business Administration Office of Inspector General investigators repeatedly concluded that this case did not warrant prosecution. In July 2023, for instance, the agency investigation was first "closed" due to "lacking prosecutorial interest."[8] Then, after Mr. Blundo provided various documents in response to a grand jury subpoena,[9] the case was "closed" again by the agency in September 2024 because the case did "not fall within SBA-OIG guidelines."[10]

**B. Ms. Chattah has a reported history of using the U.S. Attorney's Office to reward friends and punish enemies.**

Then, in April 2025, Ms. Chattah became Nevada's interim U.S. Attorney.[11] She had never before been a prosecutor.[12] And she arrived in the office as what Bloomberg Law describes as a "partisan" figure.[13] She served as the Republican National Committee's Nevada committeewoman until last year, keeping that title on the RNC's website more than three months into her DOJ tenure, after running unsuccessfully for Nevada Attorney General in 2022.[14]

What followed was documented in Bloomberg Law's June 2026 report based on interviews with two dozen Nevada lawyers and former law-enforcement officials.[15] That

[7] March 10, 2026, SBA Memorandum of Activity, Ex. B, at US-22.

[8] July 31, 2023, Report, Ex. C, at US-17.

[9] November 30, 2023, Blundo Grand Jury Subpoena, Ex. D.

[10] September 27, 2024, Report, Ex. E, at US-13; *see id.* (also identifying that the case had been "delayed" because it was not a top "investigative priorit[y]" of either the SBA or the FBI).

[11] Ex. A at 3.

[12] *Id.* at 1, 3.

[13] *Id.* at 3, 5.

[14] *Id.* at 3, 5.

[15] *See generally id.*

investigation found Ms. Chattah has repeatedly used the U.S. Attorney's Office to advance her personal and political interests. Per Bloomberg Law, Ms. Chattah:

- Pushed to launch investigations at the behest of friends and former clients;[16]
- Took calls from attorney acquaintances and intervened in their cases against her own office, seeking favorable outcomes for their clients;[17]
- Directed a line attorney to settle a Controlled Substances Act case in a manner that the line attorney—in a sworn declaration to DOJ—described as contrary to the United States' interests, citing a conversation Ms. Chattah had with a friend who represented the defendant;[18]
- Moved to terminate an Assistant U.S. Attorney one week after he complained to DOJ's ethics office about her outreach in a case brought by her former political consultant and campaign donor—even though that AUSA had a spotless record and top performance reviews;[19]
- Eighteen days into her tenure, publicized—in a since-deleted YouTube video—an investigation reportedly designed to shame or criminally charge the political opponent who defeated her in 2022, Nevada Attorney General Aaron Ford;[20]
- Had staff compile research targeting a federal judge who ruled against the government in immigration cases; that research surfaced in a critical news article about the judge;[21] and
- Publicly accused Nevada's two U.S. Senators of public corruption, without evidence.[22]

---

[16] *Id.* at 1, 3.

[17] *Id.* at 1.

[18] *Id.* at 4.

[19] *Id.*

[20] *Id.* at 5–6.

[21] *Id.* at 7.

[22] *Id.* at 2.

Commenting on his impression of these issues to Bloomberg Law, the former deputy director of DOJ's Professional Responsibility Advisory Office singled out Ms. Chattah's habit of "sidestepping recusals" as "the sort[] of thing[] that shouldn't happen in an organization that actually cares about the rules."[23] Nevada's former (Senate-confirmed) U.S. Attorney under President George H.W. Bush similarly summarized these issues bluntly: Ms. Chattah does not "understand[] how you're not supposed to use that office for personal or political purposes."[24]

**C. Ms. Chattah's history with Mr. Blundo is characterized by a political rivalry and evidence of personal animus towards him.**

Mr. Blundo has long been a member (and now the chair) of the Nye County Republican Central Committee (NCRCC), the county Republican Party's governing body.[25] He is a traditional conservative who seeks to represent rural Nevada's interests.[26] He has historically supported Governor Joe Lombardo, including by leading the Nye County Republican Party to be the first to endorse Mr. Lombardo's candidacy for governor.[27] Mr. Blundo—whose mother was an immigrant who had to leave the U.S. after her visa expired—has also supported immigration reform and DACA recipients.[28]

---

[23] *Id.* at 3.

[24] *Id.* at 2.

[25] *See* NYE CNTY. REPUBLICAN PARTY, *Message from the Chairman* (Mar. 26, 2021), https://nyegop.org/message-from-the-chairman/.

[26] *See, e.g.*, NEVADA YOUNG REPUBLICANS, *Young Republicans Advisory Council*, https://perma.cc/8LCS-4GBG (identifying that Mr. Blundo "brings a practical, business-driven approach to party leadership, emphasizing grassroots engagement, turnout, and strong local organization").

[27] *See, e.g.*, KPVM 25 TV, *LEO Blundo talks about electing Joe Lombardo* (YouTube, Sept. 25, 2025), https://www.youtube.com/watch?v=UKJl6-ZK6yI.

[28] *E.g.*, Jacob Solis, *On the Record: Republican candidate for Congressional District 4 Leo Blundo*, NEVADA INDEPENDENT (May 29, 2020), https://thenevadaindependent.com /article/on-the-record-republican-candidate-for-congressional-district-4-leo-blundo.

As both a Nye County Republican Party member and party chair, Mr. Blundo repeatedly clashed on these and other topics with Ms. Chattah. In August 2022, for instance, Mr. Blundo personally seconded a Resolution of Censure that the Nye County Republican Party adopted against Ms. Chattah and others by majority vote.[29] The following summer, the Nye County Republican Party then sought to censure Ms. Chattah by name—formally moving "to censure Nevada Republican National Committeewoman Sigal Chattah for suing Governor Joe Lombardo over his signing [of] Senate Bill 406."[30] Despite Ms. Chattah's allies' interest in rejecting that motion wholesale, Mr. Blundo supported debate and a vote on that resolution.[31] The body tabled—rather than voted down—that motion so Ms. Chattah could respond.[32] The unresolved "Sigal Chattah Response" remained on the Nye County Republican Party agenda the next month.[33]

Ms. Chattah blamed Mr. Blundo for these moves—and said so in personal terms. The censure fight is documented in two sworn declarations from percipient witnesses. In summer 2023, the Nye County Republican Party's then-Treasurer, Troy La Mana, introduced a resolution to "censure Nevada Republican National Committeewoman Sigal Chattah for suing Governor Joe Lombardo over his signing Senate Bill 406."[34] The resolution expressed strong political disapproval of Ms. Chattah's decision to do so: "Sigal's lawsuit is an affront to every

---

[29] NCRCC Meeting Mins. Aug. 13, 2022, Ex. G, at 3.

[30] NCRCC Mins. July 8, 2023, Ex. F, at 3.

[31] *See id.*; Ex. K ¶ 5.

[32] Ex. F at 3.

[33] NCRCC Call to Meeting Aug. 12, 2023, Ex. H.

[34] Ex. L ¶ 4; Ex. F at 3.

single Republican who supported and voted for this bill."[35] Mr. Blundo supported discussing the resolution and letting the membership vote on it—declining, in other words, to block it.[36]

Ms. Chattah's allies moved to table the resolution until the next meeting to allow her to respond.[37] In the interim, party members pressured Mr. Blundo to kill the resolution and pressured Mr. La Mana to withdraw it, though both refused.[38] At the next meeting, Ms. Chattah appeared in person—the only time, in Mr. La Mana's years of party involvement, that he ever saw her attend a county party meeting.[39] And she brought the statewide party chair with her in a "show of force" to scare off the resolution's supporters.[40] She spoke in her own defense and submitted a statement denouncing "baseless narratives" from "the fake news and establishment trash."[41] Ultimately, the resolution failed.[42]

Immediately after that meeting, Mr. Blundo's then-wife, Melissa Blundo, approached Ms. Chattah to explain that she believed her husband had supported debate on the resolution—not the resolution itself.[43] Ms. Chattah expressed her personal animus towards Mr. Blundo; in Ms. Chattah's words:

- Mr. Blundo is an "asshole" Ms. Chattah "cannot stand";
- Mr. Blundo is "pompous" and "thinks he is better than everyone else";
- Mr. Blundo "does not know what he is doing"; and

---

[35] Ex. L at Troy La Mana Decl., Ex. A.

[36] Ex. K ¶ 5; Ex. L ¶ 7.

[37] Ex. L ¶ 7; Ex. F at 3.

[38] *See* Ex. K ¶ 5; Ex. L ¶ 8.

[39] Ex. L ¶ 9.

[40] *Id.*

[41] Ex. K ¶ 7; *see also* Ex. I, Sigal Chattah Response (written response document, accusing supporters of the censure resolution as "relying on baseless narratives" and "fake news" and criticizing "establishment trash" who "love to perpetuate chaos among us").

[42] Ex. K ¶ 7; Ex. L ¶ 10.

[43] Ex. K ¶ 8.

- Mr. Blundo "better watch out" because "he does not know who he is fucking with."[44]

Given the context and Ms. Chattah's tone and demeanor, Ms. Blundo took those comments as threats against her husband.[45]

The hostility outlasted the meeting. Months later—after Mr. Blundo appeared in the news and while the two were still married—Ms. Chattah personally called Ms. Blundo, insisted that Mr. Blundo is a "bad person" and an "asshole," and told her she should leave him.[46] The censure's sponsor fared no better: Ms. Chattah's supporters moved to strip Mr. La Mana of his Treasurer post, and after repeated attacks on his character, he resigned—efforts he understood to be retaliation for the censure resolution.[47]

Bloomberg Law's reporting corroborates the declarations. That reporting describes this case as one involving a Republican county commissioner with whom Ms. Chattah has a history—and identifies that history as the apparent reason DOJ recused her.[48] As the Bloomberg Law piece describes:

> Chattah also repeatedly sought status updates from prosecutors investigating a Nevada Republican county commissioner with whom Chattah had a shared history, despite a DOJ recusal blocking her from engaging in the Covid-19 fraud matter, said three people familiar.[49]

The online version of the piece links to a U.S. Attorney's Office press release announcing Mr. Blundo's indictment.[50]

---

[44] *Id.*

[45] *Id.* ¶ 9.

[46] *Id.* ¶ 10.

[47] Ex. L ¶ 12.

[48] Ex. A at 4.

[49] *Id.*

[50] *See* U.S. ATT'Y'S OFFICE (D. NEV.), *Former Nye County Commissioner Indicted For COVID-19 Relief Fraud Totaling More Than $500,000* (Mar. 11, 2026), https://www.justice.

Other reporting has confirmed the same.[51] As CBS News has reported after reviewing "both documents and sources," the Deputy Attorney General's office has "issued a memo ordering [Ms. Chattah] to recuse herself" in at least six cases "involv[ing] people who had political ties to Chattah before she joined the Justice Department"—including political rivals.[52] One of those cases, per CBS News's reporting, is Mr. Blundo's.[53]

### D. Ms. Chattah reportedly violates a DOJ recusal order during the same timeframe in which she purges "dead weight" career supervisors.

Consistent with all the above, Bloomberg Law and CBS News reports that DOJ ordered Ms. Chattah recused from Mr. Blundo's case.[54] Yet she reportedly violated that recusal—repeatedly.

Federal law requires the disqualification of any DOJ officer—including those performing the duties of a U.S. Attorney—from any investigation or prosecution in which her participation "may result in a personal, financial, or political conflict of interest, or the appearance thereof."[55] The implementing regulation prohibits a DOJ employee from

---

gov/usao-nv/pr/former-nye-county-commissioner-indicted-covid-19-relief-fraud-totaling-more-500000.

[51] *See* Sarah N. Lynch, *FBI closes 2020 election fraud inquiry ordered by Nevada's top federal prosecutor, sources say*, CBS NEWS (Mar. 12, 2026), Ex. M at 3–6, also available at https://www.cbsnews.com/news/fbi-closes-2020-election-fraud-inquiry-nevada/.

[52] *Id.* at 4.

[53] *Id.* at 5 ("On Thursday, Chattah used her X account—which still refers to her as a U.S. Attorney—to comment on one of the six cases from which she was ordered to recuse. The case involves the recent indictment of Nye County Republican Commissioner Leo Blundo, who is accused of committing fraud against a government program that gave small businesses loans to keep them afloat during the COVID-19 pandemic.").

[54] *See* Ex. A; Ex. M; *see also* ECF No. 2 (unlike other indictments filed during Ms. Chattah's tenure, not including Ms. Chattah's name on the indictment). On July 17, 2026, the defense asked the assigned AUSA on the case to confirm whether Ms. Chattah was recused at the time of the indictment. As of this filing, the assigned AUSA has not responded.

[55] 28 U.S.C. § 528. Congress underscored the gravity of these recusal rules: it authorized regulations providing that a "willful violation" of them "shall result in removal from office." *Id.*

participating in a prosecution where she has a "personal or political relationship" with anyone substantially involved in the underlying conduct, or with anyone whose interests would be directly affected by the prosecution's outcome.[56] Presumably applying this framework, the Deputy Attorney General's office is reported to have recused Ms. Chattah from this matter.[57]

Ms. Chattah reportedly violated that recusal. As Bloomberg Law reports, despite the bar on her involvement—and warnings that she was disregarding recusals signed by the Deputy Attorney General's office—she repeatedly sought status updates from the prosecutors on Mr. Blundo's case.[58] Three people familiar with the matter confirmed her repeated, recusal-violating involvement in this case specifically.[59] Although such violations are against both DOJ policy and statute, they are not the only violations Ms. Chattah has engaged in: bypassing DOJ recusal orders is, per Bloomberg Law's sources, a recurring aspect of Ms. Chattah's tenure.[60]

**E. Ms. Chattah's involvement led to this case.**

After years of declinations, the process toward indicting Mr. Blundo began weeks after Ms. Chattah took office. On May 19, 2025—the month after Ms. Chattah became interim U.S.

---

[56] 28 C.F.R. § 45.2(a).

[57] Ex. A at 1, 4. The defense has reviewed the discovery produced to date; it does not include the recusal memorandum. This recusal memorandum is part of the defense's below discovery requests.

[58] Ex. A at 1, 4.

[59] *Id.* at 4.

[60] *Id.* at 1, 4. After a judge of this District invalidated her appointment as acting U.S. Attorney, Ms. Chattah's office assured courts and defense counsel that she would stop supervising cases while the disqualification order was on appeal. Ex. A at 6. Bloomberg Law reports that she remained involved anyway—at one point personally scuttling a negotiated plea agreement. *Id.*; *contra United States v. Garcia*, __ F. Supp. 3d __, 2025 WL 2784640, at *4–14 (D. Nev. Sept. 30, 2025) (concluding Ms. Chattah is illegally occupying the office); *United States v. Jackson*, __ F.4th __, 2026 WL __ (9th Cir. 2026) (same).

Attorney[61]—the U.S. Attorney's Office sent Mr. Blundo a target letter announcing that he was being investigated for wire fraud, bank fraud, money laundering, and false statements to the SBA.[62] Even then, however, the case did not immediately proceed to indictment.

Then, on February 20, 2026, the office's career First Assistant United States Attorney and the career criminal chief were removed from the office. These (and related) departures were

[61] *See* U.S. ATT'Y'S OFFICE, *Sigal Chattah Appointed Interim United States Attorney for the District of Nevada* (Apr. 1, 2025), https://perma.cc/R366-VR6M.

[62] Blundo Target Letter, Ex. J.

apparently part of Ms. Chattah's efforts to "exorcise the District of Nevada" and eliminate "[d]ead weight":[63]




Roughly two weeks later (on March 11, 2026), the U.S. Attorney's Office charged Mr. Blundo with wire fraud and money laundering related to his receipt of pandemic-era relief funds

---

[63] Sigal Chattah (@Chattah4Nevada), X (May 31, 2026, at 8:54 p.m.), https://perma.cc/3VAS-BJA3; *see also* Ex. A at 3 ("[T]he FBI leader's firing and the recent retirements of Chattah's two primary deputies have prompted concerns among former prosecutors that Chattah will escalate efforts to use the office for political purposes, such as by interfering in the midterm elections.").

for the restaurant he operates.[64] That date is just two days before the filing deadline to run for office in Nevada.[65] Because of this indictment, Mr. Blundo did not pursue any political positions this cycle.

Shortly after Mr. Blundo's indictment was issued, Ms. Chattah publicly posted about Mr. Blundo's case in a since-deleted X post, writing that "Fraud will not be tolerated in our community—regardless of the position or identity of those involved":[66]




"[A]fter CBS News sought comment from the Justice Department," Ms. Chattah deleted the post.[67]

---

[64] ECF No. 2.

[65] *See* NEV. SEC'Y OF STATE, FILING FOR NON-JUDICIAL OFFICE, https://perma.cc/N4YL-V922 (identifying the relevant filing date is "March 13, 2026").

[66] Ex. M at 5.

[67] *Id.* at 6.

Mr. Blundo was not the only Pahrump business to seek and receive pandemic relief. Public Small Business Administration data, for instance, identify roughly 600 PPP loans disbursed to Pahrump,[68] at least 22 of which exceeded $150,000.[69] And that is just Pahrump. The number of analogous PPP loan recipients in Nye County is even larger.[70] Plus, many individuals (like Mr. Blundo) received separate disbursements under the EIDL and Restaurant Revitalization Fund programs.[71]

Yet public reporting does not reveal any other federal PPP- (or EIDL- or RRF-) fraud prosecution arising from Nye County. Mr. Blundo appears to be the only one charged in Nye County for any alleged misconduct related to these 2020–2021 pandemic-era programs.

## III. ARGUMENT

Based on the facts alleged in this motion, this prosecution violates Mr. Blundo's due process and equal protection rights as presumptively vindictive and apparently selective. Ms. Chattah's political rivalry with Mr. Blundo is well documented, as are instances of her personal

---

[68] *See Who in Nevada got Paycheck Protection Program loans during the pandemic*, RENO GAZETTE J., https://data.rgj.com/paycheck-protection-program-loans/?state=Nevada&searchtext=pahrump (last visited Aug. 20, 2026) (reflecting 594 results for "Pahrump").

[69] *See PPP Loans Issued in Pahrump, NV*, PPPREPORT.ORG, https://pppreport.org/location/NV/PAHRUMP (last visited Aug. 20, 2026) (reporting 22 PPP loans over $150,000 to Pahrump businesses).

[70] *See, e.g.*, *PPP Loans Issued in Amargosa Valley, NV*, PPPREPORT.ORG, https://pppreport.org/location/NV/AMARGOSA+VALLEY/ (last visited Aug. 20, 2026) (reporting 2 PPP loans over $150,000 to Amargosa Valley businesses); *PPP Loans Issued in Beatty, NV*, PPPREPORT.ORG, https://pppreport.org/location/NV/BEATTY/ (last visited Aug. 20, 2026) (reporting 1 PPP loan over $150,000 to Beatty businesses); *PPP Loans Issued in Tonopah, NV*, PPPREPORT.ORG, https://pppreport.org/location/NV/TONOPAH/ (last visited Aug. 20, 2026) (reporting 1 PPP loan over $150,000 to Tonopah businesses).

[71] *See, e.g.*, U.S. CHAMBER OF COMMERCE, 23 FREQUENTLY ASKED PPP LOAN QUESTIONS, ANSWERED (last updated June 1, 2021) (identifying that individuals could use both an EIDL grant and PPP loans), https://www.uschamber.com/co/run/business-financing/commonly-asked-questions-coronavirus-small-business-loans.

animus towards him. Ms. Chattah's own agency found her conflicted, presumably on these same grounds, and ordered her recused from the case. Yet she is reported to have participated anyway. Absent some credible explanation, Ms. Chattah's irregular involvement in singling out Mr. Blundo for charges her office does not pursue against similarly situated others is improper, and the indictment should be dismissed with prejudice.

Either defect—vindictiveness or selectivity—independently warrants dismissal. At a minimum, together they warrant discovery and an evidentiary hearing. At this stage, Mr. Blundo need not prove vindictiveness or selectivity to a certainty. To be sure, direct evidence of vindictiveness or selectivity—which this case presents—warrants dismissal outright.[72] But short of that, a "reasonable likelihood" of vindictiveness shifts the burden to the government.[73] And discovery requires still less: "some evidence" of discriminatory purpose and effect.[74] As detailed below, the record meets all three standards. So at least discovery and an evidentiary hearing are necessary here.

Mr. Blundo does not minimize the demanding nature of these claims. Vindictive- and selective-prosecution claims ordinarily run against a "presumption of regularity" in charging decisions,[75] and courts rightly hesitate to probe prosecutorial motive in the mine run case.[76] So relief on these claims is rare. But it is rare for a structural reason: prosecutors do not typically announce their motives. So defendants must ordinarily ask courts to infer an improper purpose from circumstance alone.

---

[72] *United States v. Jenkins*, 504 F.3d 694, 699 (9th Cir. 2007).

[73] *Id.* at 700 (emphasis omitted).

[74] *United States v. Armstrong*, 517 U.S. 456, 468–69 (1996) (citation omitted); *cf. United States v. Sellers*, 906 F.3d 848, 852–55 (9th Cir. 2018) (discovery standards must remain flexible where official records, not defendant-accessible facts, hold the answers).

[75] *Armstrong*, 517 U.S. at 464.

[76] *See Wayte v. United States*, 470 U.S. 598, 607–08 (1985).

This case is different. Here, DOJ itself reportedly examined this prosecutor's relationship to this case and barred her from it. And sworn declarations and insider accounts document her threatening Mr. Blundo and defying that bar. Where DOJ's own leadership has concluded recusal is warranted, and when the head prosecutor has disregarded a recusal order, the caution that ordinarily defeats these claims instead counsels relief. That is especially so under the modest burden-shifting and "some evidence" thresholds that govern at this stage. On these facts, dismissal is warranted, and discovery and an evidentiary hearing are necessary.

**A. This prosecution appears unconstitutional.**

**1. This prosecution has the hallmarks of a vindictive one.**

Due process forbids the government from prosecuting a person to punish him for who he is or what he has lawfully done. "[F]or an agent of the State to pursue a course of action whose objective is to penalize a person's reliance on his legal rights" is "patently unconstitutional."[77] The First Amendment likewise "prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out."[78] Political candidacy, political association, and criticism of public officials sit at the core of those protections.[79] Nor is the protection limited to retaliation for protected activity. The Due Process Clause "was intended to prevent government officials from abusing their power, or

---

[77] *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978) (cleaned up).

[78] *Hartman v. Moore*, 547 U.S. 250, 256 (2006).

[79] *See Williams v. Rhodes*, 393 U.S. 23, 30–31 (1968); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964); *cf. United States v. Hastings*, 126 F.3d 310, 313 (4th Cir. 1997) (a prosecution "cannot be motivated by a suspect's exercise of constitutional rights through participation in political activity").

employing it as an instrument of oppression"—so a prosecution brought to gratify an official's personal spite is arbitrary and serves no legitimate government end.[80]

There are two paths to dismissal for prosecutorial vindictiveness:

(1) "direct evidence" of the prosecution's "punitive motivation"; and

(2) a "presumption of vindictiveness" where charges follow the exercise of a protected right "in circumstances that give rise to an appearance of vindictiveness."[81]

The second path is deliberately prophylactic: it requires only a "reasonable likelihood" that the charges would not have been brought absent the protected activity, demands no proof of bad faith, and exists "to prevent chilling the exercise of [legal] rights by other defendants who must make their choices under similar circumstances in the future."[82] Once the presumption attaches, the burden shifts to the government to prove the charges "did not stem from a vindictive motive, or [were] justified by independent reasons or intervening circumstances that dispel the appearance of vindictiveness."[83]

Both inquiries presuppose what is ordinarily a given: a disinterested prosecutor. In the typical case, the U.S. Attorney "is the representative not of an ordinary party to a controversy, but of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done."[84] But that presumption of regularity goes away where (as

---

[80] *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (cleaned up); *see Wade v. United States*, 504 U.S. 181, 185–86 (1992) (prosecutorial discretion is reviewable where its exercise is not "rationally related to any legitimate Government end").

[81] *United States v. Jenkins*, 504 F.3d 694, 699 (9th Cir. 2007) (quoting *United States v. Gallegos-Curiel*, 681 F.2d 1164, 1168 (9th Cir. 1982)).

[82] *Id.* (alteration in original) (quoting *United States v. DeMarco*, 550 F.2d 1224, 1227 (9th Cir. 1977)); *see United States v. Groves*, 571 F.2d 450, 453 (9th Cir. 1978).

[83] *Jenkins*, 504 F.3d at 699 (quoting *Gallegos-Curiel*, 681 F.2d at 1168).

[84] *Berger v. United States*, 295 U.S. 78, 88 (1935).

here) there is evidence of improper prosecutorial involvement.[85] Prosecutorial decisions infected by such "a personal interest, financial or otherwise" "may bring irrelevant or impermissible factors into the prosecutorial decision."[86] And so, because such prosecutions raise serious due process concerns, dismissal is an available remedy.[87]

Against that backdrop, this prosecution appears to be unconstitutionally vindictive. The circumstances of Ms. Chattah's involvement evidence an irregular if not vindictive prosecutorial motive involving a political rival, generating at least enough to support a presumption of vindictiveness—one that the government cannot rebut on the facts here.

**a. There is direct evidence of vindictiveness.**

**i. Ms. Chattah harbors animus toward Mr. Blundo according to observers, and her own agency presumably ordered her recused from this case for the same reason.**

Take first the animus itself. Moments after the censure fight ended, Ms. Chattah told Mr. Blundo's then-wife that he is an "asshole" she "cannot stand," that he is "pompous" and "thinks he is better than everyone else," and that he "better watch out" because "he does not know who he is fucking with."[88] Given the context—and Ms. Chattah's tone and demeanor—Ms. Blundo took those statements as threats against her husband.[89] Months later, Ms. Chattah personally called Ms. Blundo to insist that Mr. Blundo is a "bad person" and an "asshole"—

---

[85] *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 249–50 (1980); *see Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 807–14 (1987) (prosecution by a conflicted prosecutor is fundamental error).

[86] *Marshall*, 446 U.S. at 249–50.

[87] *Id.*; *see, e.g.*, *United States v. Abrego Garcia*, __ F. Supp. 3d __, 2026 WL 1454303, at *3–5 (M.D. Tenn. May 22, 2026) (dismissing indictment on those grounds).

[88] Ex. K ¶ 8.

[89] *Id.* ¶ 9.

and that his wife should leave him.[90] The censure's sponsor experienced the same hostility firsthand: at the only county party meeting Ms. Chattah ever attended, she arrived with the statewide party chair in what he understood as a "show of force," and she was, in his words, "extremely angry" that the party "would even entertain the proposal."[91] Those statements directly connect Ms. Chattah's hostility to Mr. Blundo's political activity: his refusal to kill a censure resolution aimed at her, and his support for letting his party debate and vote on it. And even divorced from that political linkage, personal hostility of this kind is an impermissible basis for prosecution.[92]

Nor did the hostility stop at words. After the censure vote, Ms. Chattah's supporters moved to strip the resolution's sponsor of his Treasurer post, and after repeated attacks on his character, he resigned—efforts he understood as retaliation for the censure resolution.[93] The sponsor lost his position. Mr. Blundo let the resolution proceed and now faces federal charges. That supports a vindictive motive.[94]

And indeed, DOJ reportedly tried to recuse Ms. Chattah in an apparent bid to avoid that precise result.[95] As relevant here, DOJ orders recusal under 28 U.S.C. § 528 and 28 C.F.R. § 45.2 for actual or apparent personal or political conflict of interest. Per Bloomberg Law's and CBS News's reporting, the Deputy Attorney General's office examined Ms. Chattah's relationship to this case and concluded she could not participate.[96] The government is poorly

---

[90] *Id.* ¶ 10.

[91] Ex. L ¶¶ 9, 11.

[92] *Lewis*, 523 U.S. at 846.

[93] Ex. L ¶ 12.

[94] *See Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 736 (1983) (statements of desire to "get even" is direct evidence of retaliatory motive).

[95] Ex. A at 1, 4; Ex. M at 4–5.

[96] Ex. A at 1, 4; Ex. M at 4–5.

positioned to dispute the conflict: per that reporting, DOJ's own leadership already found one. The ordinary "presumption of regularity" that attaches to charging decisions does not hold where DOJ itself determined that the prosecutor was not a regular, disinterested actor—and where she participated anyway.[97] In short: DOJ's own conduct—as reported—confirms the conflict, and corroborates the animus the declarations describe.

#### ii. Ms. Chattah's extrajudicial history with Mr. Blundo, a political rival, appears to have motivated her irregular interest in this case and his selection for prosecution.

Ms. Chattah's animus towards Mr. Blundo, the record indicates, is presumably the dominant motive leading to this prosecution. As Bloomberg Law reports (and contra her recusal), Ms. Chattah repeatedly sought status updates from the line prosecutors handling this matter, over explicit warnings that she was violating a recusal signed by the Deputy Attorney General's office.[98] Repeated warning-defying involvement in a case she was barred from touching is objective evidence that this prosecution serves Ms. Chattah's personal agenda—not the United States' interests.[99] And where the government "follow[s] unusual discretionary procedures" in pursuing a case, that irregularity is strong evidence of improper motive.[100]

---

[97] *Cf. Armstrong*, 517 U.S. at 464.

[98] Ex. A at 1, 4; *see also* Ex. M at 4–5.

[99] *See United States v. Fieger*, No. 07-CR-20414, 2008 WL 205244, at *15–17 (E.D. Mich. Jan. 24, 2008) (concluding that failing to follow DOJ policy by failing to adequately recuse prosecutors was evidence of vindictiveness warranting at least discovery).

[100] *United States v. Greene*, 697 F.2d 1229, 1236 (5th Cir. 1983); *see United States v. Steele*, 461 F.2d 1148, 1151–52 (9th Cir. 1972); *United States v. Falk*, 479 F.2d 616, 620–22 (7th Cir. 1973) (en banc).

The timing further supports the irregularity here.[101] For roughly four years, the government refused to charge Mr. Blundo.[102] Then Ms. Chattah joined the office. The month after she did, her office sent Mr. Blundo a target letter.[103] Then she "exorcised" the "[d]ead weight" career First Assistant and career criminal chief[104] who constituted a natural internal check on the exercise of prosecutorial discretion in charging decisions within the USAO.[105] Two weeks later, Mr. Blundo was indicted.[106] Then Ms. Chattah made an X post—and then

[101] This timing issue differs from merely complaining that "the prosecutor's actions followed the exercise of a right." *Cf. United States v. Fiore*, 779 F. Supp. 3d 1160, 1210 (D. Nev. 2025) (quotation omitted). Rather, the timing of Ms. Chattah's improper involvement in this case—over a DOJ recusal order, after multiple declinations, and years following the alleged offense conduct—buttresses the underlying animus issues. *See, e.g.*, *Abrego Garcia*, 2026 WL 1454303 at *3–5 (identifying that "reopening" an investigation and pursuing previously-known but un-acted-upon information is evidence of vindictiveness).

[102] *See* Ex. B at US-22.

[103] Ex. J.

[104] Sigal Chattah (@Chattah4Nevada), X (May 31, 2026, at 8:54 p.m.), https://perma.cc/3VAS-BJA3.

[105] *See* Ex. A at 2 (identifying that Ms. Chattah has "push[ed] out line attorneys following clashes"), 3 ("[T]he FBI leader's firing and the recent retirements of Chattah's two primary deputies have prompted concerns among former prosecutors that Chattah will escalate efforts to use the office for political purposes, such as by interfering in the midterm elections."); *see also id.* at 4 (identifying that, after "[a] week after" an Assistant United States Attorney objected to the ethics office, "[Ms.] Chattah moved to terminate him"); Ex. M at 4 ("She told senior Justice Department officials that she hoped the probe would allow Republicans to win back a congressional seat held by a Democrat, and exonerate Nevada's fake electors, one of whom she represented in private practice, sources with direct knowledge of the matter previously told CBS News. She also suggested using the probe to investigate other state attorneys general—including Ford—to establish they and the Biden White House had unlawfully conspired against the United States.").

[106] ECF No. 2.

deleted it—about Mr. Blundo's indictment.[107] Especially when coupled with Ms. Chattah's recusal-defying conduct, that sequence supports a vindictiveness finding.[108]

If more were necessary, Ms. Chattah's conduct elsewhere supports the vindictiveness here. Eighteen days into her tenure, she personally announced an investigation reportedly designed to shame or charge Aaron Ford—the political opponent who defeated her in 2022.[109] That conduct (as here) indicates she is targeting political rivals.[110]

Against this backdrop, it does not matter that line prosecutors presented this case to the grand jury. A vindictive-prosecution claim lies where the charging prosecutor "was prevailed upon to bring the charges by another with animus such that the prosecutor could be considered a 'stalking horse.'"[111] Ms. Chattah was the line prosecutors' boss. And in that capacity, she was both sitting atop the office's charging hierarchy and reportedly monitoring the case in violation of the DOJ-ordered recusal. The vindictiveness inquiry, after all, does not "hinge on the continued involvement of a particular individual"; it "focuse[s] on the conduct of the government as a whole, rather than on the conduct or retributive sentiments of a single prosecutor."[112]

In brief: Ms. Chattah has documented animus toward Mr. Blundo. Her own agency reportedly barred her from this case. Yet she reportedly insisted on involving herself in it

---

[107] Ex. M at 5.

[108] *See, e.g.*, *Abrego Garcia*, 2026 WL 1454303, at *3–5.

[109] Ex. A at 5–6.

[110] *Id.* at 1–7.

[111] *United States v. Sanders*, 211 F.3d 711, 717 (2d Cir. 2000) (citation omitted); *see United States v. Monsoor*, 77 F.3d 1031, 1034–35 (7th Cir. 1996) (third-party "ill will, whoever its bearer," may be imputed to prosecutors); *cf. United States v. Hooton*, 662 F.2d 628, 634 (9th Cir. 1981) (attribution turns on the vindictive actor's connection to the charging decision).

[112] *Thigpen v. Roberts*, 468 U.S. 27, 31 (1984); *United States v. Meyer*, 810 F.2d 1242, 1248 (D.C. Cir. 1987).

anyway. And Mr. Blundo now stands indicted. That is presumptive if not direct evidence of a punitive motivation.[113]

**b. These circumstances also create an appearance of vindictiveness.**

The record here also demonstrates an appearance of vindictiveness that triggers a presumption of vindictiveness. Mr. Blundo engaged in protected political activity: serving in public office, participating in county and state Republican party politics, and politically opposing Ms. Chattah. He now faces federal charges driven by a prosecutor whom DOJ recused for conflicts and who apparently violated that recusal to stay involved in prosecuting Mr. Blundo. A reasonable observer would see at least a "reasonable likelihood" this prosecution punishes Mr. Blundo for his political activity and identity.[114] And tolerating it would chill exactly what the doctrine protects: the willingness of others to run against, criticize, or oppose those who hold federal prosecutorial power.[115]

Holding as much does not require disturbing the principle that initial charging decisions enjoy deference as the Supreme Court stated in *United States v. Goodwin*, 457 U.S. 368, 381–82 (1982). *Goodwin*'s caution rests on the premise that pretrial charging reflects a prosecutor's evolving, legitimate assessment of the case.[116] But that premise collapses where DOJ itself has recused the head prosecutor and she has reportedly defied the resulting recusal.[117]

---

[113] *Jenkins*, 504 F.3d at 699.

[114] *Id.* (emphasis omitted).

[115] *See id.*; *United States v. P.H.E., Inc.*, 965 F.2d 848, 858–60 (10th Cir. 1992) (presumption of vindictiveness where indictment is tainted by an effort to curtail protected speech).

[116] *See Goodwin*, 457 U.S. at 381–82.

[117] *See Berger*, 295 U.S. at 88; *Marshall*, 446 U.S. at 249–50; *accord, e.g.*, *Abrego Garcia*, 2026 WL 1454303, at *10 (dismissing indictment for vindictive prosecution where, as relevant here, charging prosecutor was "not objectively independent" and instead worked under "tainted actors").

Instead, once the presumption of vindictiveness attaches in this setting, the government must prove this prosecution "did not stem from a vindictive motive" or was "justified by independent reasons."[118] The government will be unable to independently justify this prosecution after four years of declining to bring it at all. This case started with a tip from an "anonymous complainant" four years ago.[119] In the time since, the government repeatedly closed this case, both for "lack[] [of] prosecutorial interest"[120] and because charging it would not "fall within SBA-OIG guidelines."[121] The government bears the burden of coming forward with independent reasons justifying its decision to institute charges. After those years of its own declinations, that will be a difficult showing to make.

**2. This prosecution appears selective.**

Independent of vindictiveness, this prosecution also appears to be unconstitutionally selective. Equal protection principles forbid the government from basing the decision to prosecute on "an unjustifiable standard such as race, religion, or other arbitrary classification,"[122] including "the exercise of protected statutory and constitutional rights."[123] A defendant may also challenge a prosecution as a "class of one" by showing he was "intentionally treated differently from others similarly situated" without rational basis.[124] However viewed, a

---

[118] *Jenkins*, 504 F.3d at 699 (citation omitted).

[119] Ex. B at US-22; *cf. Abrego Garcia*, 2026 WL 1454303, at *11 (proceeding with prosecution despite recommendations otherwise supports vindictiveness finding).

[120] Ex. C at US-17.

[121] Ex. E at US-13.

[122] *Armstrong*, 517 U.S. at 464 (citation omitted).

[123] *Wayte*, 470 U.S. at 608.

[124] *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *see United States v. Torquato*, 602 F.2d 564, 568–69 & n.9 (3d Cir. 1979) (selective prosecution claim lies for "personal or political bias"); *see also Goodfellas, Inc. v. Dunkel*, 2016 WL 6599977, at *9 (M.D. Pa. Nov. 8, 2016) (personal bias unrelated to suspect classifications is a cognizable "arbitrary factor" for selective enforcement).

prosecution is unconstitutionally selective when it has both a discriminatory purpose and a discriminatory effect.[125]

This prosecution appears suspect under these principles. First, there is evidence of a discriminatory purpose: attacking a political rival. The government has itself recognized that a defendant may carry a selective-prosecution claim through "direct admissions by [prosecutors] of discriminatory purpose."[126] The reported recusal is the government's own contemporaneous determination that Ms. Chattah's participation posed at least a personal or political conflict—or the appearance of one. And she reportedly participated anyway. The evidence here mirrors the vindictiveness showing above: Ms. Chattah's documented animus toward Mr. Blundo;[127] DOJ's own reported conflict finding;[128] Ms. Chattah's apparent recusal-defying surveillance of this case;[129] and her ostensible pattern of deploying the office against political opponents.[130] The Ninth Circuit has long recognized that enforcement focused on those who antagonize the government is "inherently suspect."[131] Prosecution focused on those who antagonize the prosecutor personally—the situation here—is worse still.[132] And the neutrality of the charged

---

[125] *Armstrong*, 517 U.S. at 465.

[126] *Id.* at 469 n.3 (citing Brief for United States).

[127] *See* Ex. K ¶¶ 8, 10; Ex. L ¶¶ 8–12.

[128] Ex. A at 4; Ex. M at 4–5.

[129] Ex. A at 4; Ex. M at 4–5.

[130] Ex. A at 1–7; Ex. M at 4.

[131] *Steele*, 461 F.2d at 1152.

[132] *See Marshall*, 446 U.S. at 249–50; *Torquato*, 602 F.2d at 568–69.

statute is no answer. A facially ordinary fraud charge can serve a discriminatory purpose as readily as an overtly political one.[133] The question is why this defendant was singled out.[134]

Second, there is a discriminatory effect. This element asks whether "similarly situated individuals . . . were not prosecuted."[135] Here, they were not. As detailed above and below, pandemic-relief loan prosecutions are rare. Outside this case, they are apparently non-existent in Nye County and Pahrump. And in fact, for four years—until Ms. Chattah decided otherwise—even this prosecution fit that non-prosecution mold. That Mr. Blundo was targeted for prosecution against this non-prosecution norm reveals a constitutionally prohibited discriminatory effect.

Start with the national non-prosecution landscape. Less than a hundredth of one percent (0.0075%) of all pandemic-relief loans—and less than 0.2% of loans SBA itself flagged for potential fraud—have resulted in prosecutions.[136] The government issued over 15 million pandemic-relief loans, including over 11.8 million PPP loans and over 3.9 million EIDL loans.[137] Roughly 669,000 of those were flagged as potentially fraudulent and referred for

---

[133] *See, e.g.*, Mot. Dismiss for Vindictive & Selective Prosecution, *United States v. James*, No. 2:25-cr-00122-JKW-DEM, ECF No. 53 (E.D. Va. Nov. 7, 2025) (moving to dismiss mortgage fraud charges on these grounds), *mooted by dismissal on other grounds*, 810 F. Supp. 3d 752 (E.D. Va. 2025), *government appeal filed*, No. 25-4673 (4th Cir. Dec. 22, 2025); *see also Trump v. Cook*, 609 U.S. (2026) (attempted firing of government official based on contested fraud claims).

[134] As explained above, this showing does not turn on the direction of Ms. Chattah's interference. Either way, the factor distinguishing Mr. Blundo from every uncharged comparator is his personal relationship with the U.S. Attorney. That is discriminatory purpose.

[135] *Armstrong*, 517 U.S. at 465; *United States v. Venable*, 666 F.3d 893, 900–01 (4th Cir. 2012); *see Steele*, 461 F.2d at 1151 (comparing prosecuted census protestor with unprosecuted violators).

[136] *See* SBA OIG, *COVID-19 Pandemic EIDL and PPP Loan Fraud Landscape*, Report 23-09, at 1 (June 27, 2023), available at https://www.sba.gov/document/report-23-09-covid-19-pandemic-eidl-ppp-loan-fraud-landscape.

[137] *See Business Loan Program Temporary Changes; Paycheck Protection Program—Extension of Lender Records Retention Requirements*, 89 Fed. Reg. 68090 (Aug. 23, 2024)

investigation.[138] Yet prosecutions are a fraction of a percent of that pool: between March 2020 and September 2023, the SBA OIG reported just 1,180 PPP- or EIDL-fraud indictments nationwide—roughly 0.18% of the flagged loans.[139]

And the enforcement gap has only widened since. In April 2026, the SBA referred 562,000 suspected fraudulent loans to Treasury.[140] But fewer than 1,000 of those borrowers—again, less than 0.2% of flagged loans—were investigated (never mind prosecuted).[141] All told, then, less than a quarter of a percent of flagged loans (and less than one hundredth of a percent of all loans) have resulted in prosecutions.

The local numbers for Pahrump and Nye County are even starker. The comparator inquiry turns on isolating the right variable: the control group is one "similarly situated in all respects" to the defendant "except for the attribute" on which the selectivity claim rests.[142] Here, that group is easy to define. Public data disclose at least 22 PPP loans over $150,000 in Pahrump and an undisclosed number below that threshold.[143] Those are the borrowers identical to Mr. Blundo in every respect that should matter. Yet there appear to have been no prosecutions of

---

(identifying that "the total number of PPP loans guaranteed by SBA exceeds 11.8 million"); SBA, *Disaster Assistance Update—Nationwide COVID EIDL, Targeted EIDL Advances, Supplemental Targeted Advances* (Apr. 28, 2022) (identifying 3,923,374 EIDL loans approved), https://www.sba.gov/document/report-covid-19-eidl-reports-2022.

[138] SBA OIG, *COVID-19 Pandemic EIDL and PPP Loan Fraud Landscape*, Report 23-09, at 1 (June 27, 2023), available at https://www.sba.gov/document/report-23-09-covid-19-pandemic-eidl-ppp-loan-fraud-landscape.

[139] *Id.*

[140] SBA, *SBA Sends 562,000 Suspected Fraudulent Loans to Treasury for Collections Totaling $22 Billion* (Apr. 24, 2026), https://www.sba.gov/article/2026/04/24/sba-sends-562000-suspected-fraudulent-loans-treasury-collections-totaling-22-billion.

[141] *Id.*

[142] *United States v. Aguilar*, 883 F.2d 662, 706–07 (9th Cir. 1989).

[143] *PPP Loans Issued in Pahrump, NV*, PPPREPORT.ORG, https://pppreport.org/location/NV/PAHRUMP (last visited Aug. 20, 2026) (reporting 22 PPP loans over $150,000 to Pahrump businesses).

any of those entities, regardless of size. Instead, the government has apparently charged just one recipient: the sitting chair of the county Republican Party, a man with a documented political and personal history with the very prosecutor who controls the office, and from whose case that prosecutor had been reportedly ordered to recuse.

Were there any doubt about the selectivity here, Mr. Blundo himself was not prosecuted for over four years for this alleged conduct. As detailed above, investigators first received a tip from an "anonymous complainant" four years ago.[144] They then investigated that tip (including with various grand jury subpoenas, including to Mr. Blundo himself).[145] Yet they repeatedly concluded that the prosecution should not go forward, both for "lack[] [of] prosecutorial interest"[146] and because charging it would not "fall within SBA-OIG guidelines."[147] Until Ms. Chattah became lead prosecutor, Mr. Blundo was part of the over 99.99% of PPP borrowers nationally (and the 100% of borrowers locally) who had never been prosecuted.

All this supports discriminatory effect. Coupled with the apparently discriminatory motive—detailed above—this prosecution is thus unconstitutionally selective. That likewise warrants relief, absent a credible rebuttal by the government.

---

[144] Ex. B at US-22.

[145] *E.g.*, Ex. D.

[146] Ex. C at US-17.

[147] Ex. E at US-13.

### B. These constitutional violations, if unrebutted, warrant relief.

#### 1. The Court should order dismissal with prejudice—both as relief for the vindictiveness and selectivity of this prosecution and under its inherent supervisory powers.

To remedy these violations, the Court should dismiss the indictment with prejudice. That is the ordinary result for vindictive or selective prosecutions.[148] It should likewise follow here.

Dismissal on these grounds is also appropriate under the Court's own supervisory powers.[149] Those powers exist "to implement a remedy for violation of recognized rights, to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury, and finally, as a remedy designed to deter illegal conduct."[150] They "can be utilized whenever the administration of justice is tainted."[151] The prosecution's "conduct need not be so unfair or imprudent as to offend 'due process' before exercise of this supervisory power is appropriate."[152] And so courts use their supervisory powers to dismiss indictments with prejudice where "there is (1) flagrant misbehavior and (2) substantial prejudice," and where there is "no lesser remedial action available."[153]

---

[148] *E.g.*, *Jenkins*, 504 F.3d at 702; *Abrego Garcia*, 2026 WL 1454303, at *10.

[149] The defense is separately filing a motion to dismiss for outrageous government conduct. Although the standards are similar, the supervisory authority discussion here relates to the unique combination of vindictiveness, selectivity, and recusal-violating behavior implicated by this motion. The discussion in Mr. Blundo's companion motion relates to the specific violations identified there.

[150] *United States v. Hasting*, 461 U.S. 499, 505 (1983).

[151] *United States v. Banks*, 383 F. Supp. 389, 392 (D.S.D. 1974).

[152] *Banks*, 383 F. Supp. at 392 (citing *McNabb v. United States*, 318 U.S. 332, 340 (1943), *superseded by statute on other grounds as recognized by Corley v. United States*, 556 U.S. 303 (2009)).

[153] *United States v. Bundy*, 968 F.3d 1019, 1031 (9th Cir. 2020) (quoting *United States v. Kearns*, 5 F.3d 1251, 1253 (9th Cir. 1993) and *United States v. Chapman*, 524 F.3d 1073, 1087 (9th Cir. 2008)) (internal quotation marks omitted).

All such requirements appear to be met here. The irregular prosecutorial conduct is, for starters, open and obvious. The Deputy Attorney General's office reportedly identified Ms. Chattah's conflict of interest, recused her, and warned her not to be involved in this case. Yet she reportedly violated the recusal repeatedly.[154] Congress considers willful recusal violations grounds for removal from office.[155] And her disregard of this apparent recusal order is seemingly part of a pattern of disregarding other checks on her authority: other recusals[156] and even assurances her office gave courts about her disqualification.[157]

Mr. Blundo has suffered prejudice as a result of this irregular conduct. But for Ms. Chattah's apparent animus, Mr. Blundo would not be a federal defendant. And it likewise stopped him from exercising his rights to run for office: the indictment came just two days before the deadline to run—and so specifically caused him not to stand for any election. Moreover, if successful, this case would result in Mr. Blundo's only felony conviction, tarnishing his political reputation and limiting his constitutional and civil rights.

Absent a credible rebuttal, dismissal with prejudice is appropriate. Dismissal without prejudice would invite the government to re-indict. That is especially so because that office remains under Ms. Chattah's control.[158] And Bloomberg Law reports that she has already proven that recusals, warnings, and judicial assurances do not constrain her.[159] Reassigning the case within her office fails for the same reason: reports indicate Ms. Chattah has repeatedly

---

[154] Ex. A at 1, 4; Ex. M at 5–6.

[155] 28 U.S.C. § 528.

[156] Ex. A at 1, 3; Ex. M at 4–5.

[157] *Id.* at 6.

[158] On August 17, 2026, the Ninth Circuit held that Ms. Chattah's ongoing leadership of the U.S. Attorney's Office was invalid. *United States v. Jackson*, __ F.4th __, 2026 WL __ (9th Cir. 2026). It is not yet clear whether the government will seek further discretionary appellate relief of that decision.

[159] Ex. A at 1, 4, 6; Ex. M at 4–5.

evaded ordered recusals.[160] Only dismissal with prejudice removes this case from Ms. Chattah's orbit and accomplishes a deterrent objective.[161]

**2. Alternatively and at a minimum, the Court should order discovery and an evidentiary hearing.**

If the Court does not dismiss on the present record, Mr. Blundo has at least made the threshold showings for discovery and an evidentiary hearing. For vindictiveness claims, a defendant who presents objective evidence raising a "reasonable likelihood" of vindictiveness is entitled to factual development.[162] For selective-prosecution claims, discovery requires only "some evidence tending to show the existence" of discriminatory effect and intent.[163]

This case clears those hurdles. Mr. Blundo has presented this Court with reporting of a DOJ-issued recusal, sworn declarations revealing personal animus, and three insider accounts of recusal violations in this very case. And that is against a backdrop of repeated declinations for years to bring this prosecution before Ms. Chattah assumed office.[164] Ms. Chattah's various documented improprieties at a minimum "raise an eyebrow high enough as to require a further explanation."[165] So there is at least a "reasonable likelihood" of vindictiveness and "some

---

[160] Ex. A at 1, 4, 6; Ex. M at 4–5.

[161] *See, e.g.*, *United States v. P.H.E., Inc.*, 965 F.2d 848, 859 (10th Cir. 1992) ("[W]here, as here, a prosecution is premised on the fruits of constitutionally tainted behavior, we cannot permit the prosecution to continue, notwithstanding attempts to launder the taint by presenting the fruits to an independent prosecutor.").

[162] *See Jenkins*, 504 F.3d at 700 (emphasis omitted).

[163] *Armstrong*, 517 U.S. at 468–69 (citation omitted); *cf. United States v. Sellers*, 906 F.3d 848, 852–55 (9th Cir. 2018) (discovery standards must remain flexible where official records, not defendant-accessible facts, hold the answers).

[164] *See, e.g.*, *United States v. Zakhari*, 85 F.4th 367, 381–84 (6th Cir. 2023) (reversing district court's failure to order discovery on vindictive prosecution claim where government changed charging decisions seven months later, after defendant litigated pretrial motion).

[165] *United States v. Tuitt*, 68 F. Supp. 2d 4, 18 (D. Mass. 1999) (ordering discovery in selective prosecution setting where (as here) no prosecutions had been brought against

evidence" of selectivity here.[166] That warrants discovery and an evidentiary hearing.[167] And, indeed, courts have repeatedly ordered exactly that in analogous prosecutions over the past eighteen months.[168]

---

comparator group); *United States v. Dwyer*, 287 F. Supp. 2d 82, 88–91 (D. Mass. 2003) (same "eyebrow" quote; ordering discovery in vindictive prosecution setting); *see also Fieger*, 2008 WL 205244, at *15–17 (ordering discovery on vindictiveness where, as relevant here, prosecutors violated DOJ recusal policy).

[166] *Jenkins*, 504 F.3d at 700 (emphasis omitted); *Armstrong*, 517 U.S. at 469.

[167] *See, e.g.*, *id.*; *United States v. Adams*, 870 F.2d 1140, 1145–46 (6th Cir. 1989) (reversing district court's failure to order discovery in alleged tax fraud case where (as here) defendant had exercised a right that inconvenienced an official and defense provided sworn statement that relevant decisionmakers "instigated the prosecution . . . out of 'revenge'"); *United States v. Petrova*, No. 25-10272-LTS, 2026 WL 892470, at *4–8 (D. Mass. Apr. 1, 2026) (ordering discovery on vindictive and selective prosecution motion where, as here, there were few-to-no similarly situated individuals prosecuted, defendant's particular position was at least "a factor" in charging decision, and government conduct "did not even follow [its] own rules"); *United States v. Carey*, 816 F. Supp. 3d 129, 142–44 (D.D.C. 2026) (ordering discovery on vindictive prosecution where, as here, defendant's First Amendment activity "might have played a role" in prosecution decision; such facts "easily clear[]" bar for discovery); *United States v. Abrego Garcia*, 802 F. Supp. 3d 1055, 1062–64 (M.D. Tenn. 2025) (ordering discovery on vindictive and selective prosecution motion where, as here, relevant prosecutors had some "stake" in punishing defendant for protected conduct); *United States v. Abrego Garcia*, No. 3:25-cr-00115, 2025 WL 3768093, at *2–3 (M.D. Tenn. Dec. 3, 2025) (ordering that such discovery be provided to the defense).

[168] *E.g.*, *Petrova*, 2026 WL 892470, at *4–8; *Carey*, 816 F. Supp. 3d at 142–44; *Abrego Garcia*, 802 F. Supp. 3d at 1062–64; *see also* Mot. Dismiss for Vindictive & Selective Prosecution, *United States v. Comey*, No. 4:26-cr-00016-FL-RN, ECF No. 36 (E.D.N.C. July 28, 2026); Mot. Dismiss for Vindictive & Selective Prosecution, *United States v. Comey*, No. 1:25-cr-00272-MSN, ECF No. 59 (E.D. Va. Oct. 20, 2025), *mooted by dismissal on other grounds*, 810 F. Supp. 3d 768 (E.D. Va. 2025), *government appeal filed*, No. 25-4674 (4th Cir. Dec. 22, 2025); Mot. Dismiss for Vindictive & Selective Prosecution, *United States v. James*, No. 2:25-cr-00122-JKW-DEM, ECF No. 53 (E.D. Va. Nov. 7, 2025), *mooted by dismissal on other grounds*, 810 F. Supp. 3d 752 (E.D. Va. 2025), *government appeal filed*, No. 25-4673 (4th Cir. Dec. 22, 2025); *United States v. Stewart*, No. 25-mj-0225, 2025 WL 2902164, at *1 n.2 (D.D.C. Oct. 9, 2025) (identifying a similar prosecution after defendant asserted a right to a preliminary hearing was "arguably enough to raise such a presumption [of vindictiveness]"), *overruled on other grounds*, 810 F. Supp. 3d 65 (D.D.C. 2025).

That is especially so because every document that would confirm or refute these claims—the recusal memorandum, the warnings, Ms. Chattah's communications—sits exclusively in the government's files. Mr. Blundo cannot produce what only the government holds. That asymmetry is why the discovery threshold is modest, and why courts keep it "flexible" where official records, not defendant-accessible facts, hold the answers.[169]

The government should thus be ordered to produce:

- All information related to the anonymous complainant that initiated this investigation.
- The recusal determination itself, and all communications to, from, or within the Deputy Attorney General's office (and the Executive Office for U.S. Attorneys) concerning Ms. Chattah's recusal from this matter, including any warnings issued to her;
- All communications involving Ms. Chattah that refer or relate to Mr. Blundo, this investigation, or this prosecution—including communications sent or received on personal devices, accounts, or messaging applications, which Ms. Chattah is known to use for official business;
- All communications in which Ms. Chattah sought, received, or discussed status updates, charging decisions, or case strategy concerning this matter;
- All charging memoranda, prosecution memoranda, declination recommendations, and related internal deliberations concerning Mr. Blundo; and
- Documents sufficient to identify all DOJ personnel with knowledge of Ms. Chattah's involvement in this matter after her ordered recusal.

The Court should then hold an evidentiary hearing at which the defense may examine, under oath, Ms. Chattah and DOJ personnel with direct knowledge of her reported recusal violations—including the individuals whose accounts are reflected in Exhibit A, once identified through the discovery above. Under whatever lens, then, the government should be ordered to provide them to the defense.

[169] *Sellers*, 906 F.3d at 852–55.

## IV. CONCLUSION

As three people with direct knowledge report, DOJ barred Sigal Chattah from this case because of her documented conflicts of interest. Yet she reportedly drove it anyway, against a political rival DOJ had declined to prosecute for over four years. That is vindictive prosecution. And it is selective prosecution. This case should be dismissed with prejudice. At a minimum, the Court should order discovery into the government's charging decisions and hold an evidentiary hearing at which Ms. Chattah and those with knowledge of her recusal violations testify.

Dated: August 24, 2026.

RENE L. VALLADARES
Federal Public Defender

By: */s/ Sean A. McClelland*
SEAN A. MCCLELLAND
Assistant Federal Public Defender

*/s/ Heidi Ojeda*
HEIDI OJEDA
Assistant Federal Public Defender